EUROPEAN NAVAL STORES COMPANY, S. A., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13082. Promulgated August 5, 1948.

Robert J. Bird, Esq., for the petitioner.
Bernard D. Hathcock, Esq., for the respondent.

OPINION.

ARUNDELL, *Judge*: The principal question before the Court is whether the petitioner, a foreign corporation, was engaged in a trade or business within the United States during the calendar year 1942 and therefore taxable under the provisions of section 231 (b) of the Internal Revenue Code. Section 231 of the code and section 29.231–1 of Treasury Regulations 111, material to the question presented herein, are set out below.[1] The deficiency notice served on petitioner in the present case stated, "It is held that you were a resident foreign corporation engaged in a trade or business within the United States during the taxable year 1942 ."

---

[1] SEC. 231. TAX ON FOREIGN CORPORATIONS.

(a) NONRESIDENT CORPORATIONS.—

(1) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 13 and 14, upon the amount received by every foreign corporation not engaged in trade or business within the United States from sources within the United States as interest (except interest on deposits wtih persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 30 per centum of such amount * * *.

132

Petitioner's tax liability, as determined by the respondent, rests essentially upon the question of whether the sale of naval stores owned by petitioner and sold by the Peninsular-Lurton Co. to itself in March 1942, constituted engaging in a trade or business. The "office or place of business test," formerly a part of section 231 of the Internal Revenue Code, was eliminated by section 160 (d) of the Revenue Act of 1942. The question as to what activities of a taxpayer constitute the carrying on of a business is one of fact. *Higgins* v. *Commissioner*, 312 U. S. 212.

Upon close consideration of the facts in the present case we have reached the conclusion that petitioner was not engaged in a trade or business within the United States during the taxable year involved. It had no offices, showrooms, factories, officers, employees, or salesmen in this country. Ordinarily, all transactions between petitioner and the Peninsular-Lurton Co. were negotiated and consummated by cable and letter from petitioner's Antwerp offices, and it had at no time obtained a license or permit of any kind to transact business within the United States. Petitioner, with the exception of the sale in issue, had never sold merchandise within the United States, and no one in this country was authorized to represent or act for it in its ordinary business operations. During the years 1940 to 1945 its property in the United States consisted of the naval stores sold in 1942, a credit balance with the Peninsular-Lurton Co., and a bank account in the National City Bank of New York. No person within the United States was authorized to draw on that account, and the only withdrawal from 1940 to 1947 was the amount of $1 for expenses incurred in connection with a report to the United States Treasury. It is clear that this account was not used in doing business within the United States. The credit balance remained during the war years with the Peninsular-Lurton Co. only because no further trade or communication was possible between the petitioner and that company. No interest was received by petitioner on the accumulated credit, or, as far as the record indicates, on the $79,000 loaned by petitioner to Peninsular-Lurton from that credit balance.

Under the facts we have found in the instant case it is equally clear that this isolated sale in 1942, the profit from which was credited to the account of the petitioner, can not be considered as an example of its engaging in a trade or business within the United States within

(b) Resident Corporations.—A foreign corporation engaged in trade or business within the United States shall be taxable as provided in section 14 (e) (1) and section 15.
Sec. 29.231–1. Taxation of Foreign Corporations.—For the purposes of this section * * * foreign corporations are divided into two classes : (a) foreign corporations not engaged in trade or business within the United States at any time within the taxable year, referred to in the regulations as nonresident foreign corporations (see section 29.3797–8) ; and (b) foreign corporations which at any time within the taxable year are engaged in trade or business within the United States, referred to in the regulations as resident foreign corporations (see section 29.3797–8).

the meaning of section 231 (b). The naval stores involved had been purchased in 1939 for shipment and delivery in 1940, and at one time had actually been loaded aboard ship. Unloading of the goods and eventually their removal to storage yards was necessitated, first, by the embargoes put on the shipment of such goods, and, finally, by the occupation of Belgium and most of Europe by the German Armies in May of 1940. No communication with the United States by petitioner was possible between that date and September of 1944, when the Germans evacuated Antwerp.

The uncontradicted facts conclusively show that the repurchase of the naval stores by the Peninsular-Lurton Co. in March of 1942 was a transaction not contemplated by petitioner when the goods were first purchased, and was a sale that was effected without its authority or knowledge. Petitioner had never in its history sold its goods to firms within the United States and was organized for the specific purpose of selling in the countries of continental Europe. Such a sale, even when viewed without regard for the unusual circumstances which surrounded it, could hardly be held to constitute the petitioner's engaging in a trade or business in the United States.

The meaning of the phrases "engaged in business," "carrying on business," and "doing business" were defined by the Circuit Court of Appeals for the Third Circuit in *Lewellyn* v. *Pittsburgh, B. & L. E. R. Co.*, 222 Fed. 177. It was stated therein that, "The three expressions, either separately, or connectedly, convey the idea of progression, continuity, or sustained activity. 'Engaged in business' means occupied in business; employed in business. 'Carrying on business' does not mean the performance of a single disconnected business act. It means conducting, prosecuting, and continuing business by performing progressively all the acts normally incident thereto, and likewise the expression 'doing business', when employed as descriptive of an occupation, conveys the idea of business being done, not from time to time, but all the time.   *   *   *" Cf. G. C. M. 17014, XV–2 C. B. 317 (1936), and G. C. M. 18835, 1937–2 C. B. 141.

What constitutes doing business or not doing business for tax purposes was considered in *Edwards* v. *Chile Copper Co.*, 270 U. S. 452. In construing an exempting clause, "when not engaged in business," the Court stated: "The exemption 'when not engaged in business' ordinarily would seem pretty nearly equivalent to when not pursuing the ends for which the corporation was organized in the cases where the end is profit."

It could hardly be contended that this isolated sale was of the type for which the corporation was organized, or that, as far as petitioner was concerned, the purpose was to realize a profit. It was only because of conditions beyond petitioner's control that the goods were present within the United States, and it was with its complete lack of knowl-

edge and consent that they were ultimately sold. This sale was not made in the regular course of the trade in which petitioner was engaged, but was the result of an assumption of authority and was more in the nature of a salvage operation gratuitously undertaken by the Peninsular-Lurton Co.

It is contended by respondent that the Peninsular-Lurton Co. was an agency of the petitioner in the United States. It is conceded herein that Peninsular-Lurton was organized and controlled by the same interests that controlled petitioner and other foreign corporations engaged in the naval stores business. It is true that this company was organized and operated as the American branch of the Speth controlled group of corporations. However, this corporation was organized under the laws of the United States, and its corporate entity can not be disregarded simply upon a showing that the controlling interest was owned by another corporation engaged in a similar business outside of the United States. There is no evidence that Peninsular-Lurton extended its activities beyond the sphere for which it was organized, or made its facilities available to the petitioner or other corporations engaged in the naval stores business beyond those services customarily exchanged between vendor and vendee.

The fact that the Peninsular-Lurton Co. was organized and operated as a factor is, in itself, of no significance. There is no evidence that it was organized or acted as the agent of petitioner or that it accorded the petitioner any preferential treatment in the business dealings between the two firms. It was pointed out that Peninsular-Lurton demanded, as did all other American firms in 1939 and 1940, drafts on American banks in payment, even from the petitioner.

Respondent contends that the removal of goods from aboard ship after the sailing was canceled, the storage of the goods for petitioner, and the eventual sale of the goods were acts beyond those required of a vendor. It may be conceded at the outset that such acts were not required of Peninsular-Lurton. Legally, it may well have performed its duty to petitioner in loading the goods and securing insurance.

There was no formal expression of a contract of agency which imposed a duty on this company to mitigate the damage that was certain to be sustained by the petitioner if the goods could not be shipped and no one in this country removed them to safe storage. It is the opinion of this Court that Peninsular-Lurton did for the petitioner only what any vendor, under the peculiar circumstances of the instant case, would have done for its purchaser, and that such voluntary assumption of control did not alter the basic vendor-vendee relationship.

In *Esmond Mills* v. *Commissioner*, 132 Fed. (2d) 753; certiorari denied, 319 U. S. 770, the court in adopting the language of the decision of the Board of Tax Appeals in the same case said: "The relationship of agency rests on a contract, express or implied, between the parties.

Its characteristics are well known. It involves, *inter alia*, the power of the agent to bind his principal as to third persons; the existence of a fiduciary relationship between principal and agent; and the right of the principal to control the conduct of the agent with respect to matters entrusted to him." This isolated and unprecedented assertion of authority did not bring into existence an agency relationship where the past business activities and the intent of the parties were inconsistent with such an arrangement. Petitioner's acquiescence in the acts of the Peninsular-Lurton Co. and taking the benefits thereof were indicative of the acceptance of gratuitous services rendered by the seller to its purchaser rather than the ratification by a principal of the acts of an agent acting outside the scope of its authority. Though it is our belief that the facts herein fail to disclose the existence of an agency relationship in this case, the fact remains that this lone and unique transaction, even had it been accomplished by means of an agency, would not have constituted doing business within the meaning of section 231 (b).

It being our conclusion that petitioner was, during the taxable year in question, a nonresident corporation not engaged in a trade or business within the United States, consideration of the secondary issues raised by the petition and answer is unnecessary.

*Decision will be entered for the petitioner.*